# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE

Assigned on Briefs May 18, 2011

## STATE OF TENNESSEE v. ELGENE KENTEA PORTER

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-60935    Don R. Ash, Judge**

---

### No. M2010-01628-CCA-R3-CD - Filed March 30, 2012

---

A Rutherford County Grand Jury returned an indictment against Defendant, Elgene Kentea
Porter, for aggravated rape, aggravated robbery, and misdemeanor evading arrest. Defendant
was convicted of aggravated rape, robbery, and evading arrest. The trial court sentenced
Defendant to twenty-five years at 100% for aggravated rape, six years at 30% for robbery, and
eleven months, twenty-nine days for evading arrest, to be served as an effective thirty-one-
year sentence in the Department of Correction. On appeal, Defendant argues that the trial
court erred in admitting evidence of the rape kit into evidence and that the evidence was
insufficient to support his robbery conviction. After a thorough review, we affirm the
judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT,
JR., J., joined. JUDGE J.C. MCLIN was originally on the panel to which this case was assigned.
Judge McLin died September 3, 2011, and we acknowledge his faithful service to this Court.

Mitchell E. Shannon, Murfreesboro, Tennessee, for the Appellant, Elgene Kentea Porter.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Tornton, Assistant Attorney
General; William C. Whitesell, Jr., District Attorney General; J. Paul Newman, Assistant
District Attorney General; and Jude Santana, Assistant District Attorney General, for the
Appellee, the State of Tennessee

**OPINION**

**I. Background**

On April 10, 2007, the victim was living at 205 Arnette Street in Murfreesboro, Tennessee with Suzanne White and Cindy Hudgins. The house was divided into two apartments, and the victim lived upstairs, while Ms. White and Ms. Hudgins lived downstairs. That night when the victim arrived home from working out, Ms. White and Ms. Hudgins invited her to join them at Gentleman Jim's, a local bar. The victim drove the two women to the bar around 10:00 p.m. After arriving at the bar, they sat down at a table and ordered a pitcher of beer. The victim estimated that she drank "[p]robably about two beers."

The victim testified that she saw two acquaintances at the bar, Lockland Slusher, and Tyson Cannon, who was with Defendant. She asked Defendant's name, and he showed her a tattoo of the name "Twin" on his arm, and she called him "Twin from that point on." She did not know his real name at the time. The victim testified that Defendant sat at the table with them, and she noticed him looking at "another girl at the bar" but "he didn't really talk that much." Mr. Cannon and someone named "Anthony" also sat with them. At approximately 3:00 a.m., the group left the bar and decided "to go back to the house and hang out for a while." The victim drove home with her two neighbors, and Mr. Cannon and Defendant left in a separate car. She testified that Mr. Cannon and Defendant wanted to buy some more beer, so they stopped at a gas station on the corner and bought a 24-pack of Michelob Ultra.

The victim testified that when the group, including Anthony, arrived at the house on Arnette Street, Ms. White indicated that she had to go to work later in the morning and needed to sleep. The victim then invited the remainder of the group upstairs to her apartment so they would not disturb Ms. White. The victim testified that she offered to make martinis for everyone and also decided to open a bottle of wine. Defendant then indicated that he would rather have a glass of wine than the martini. The victim testified that at some point, Defendant accidently broke a wine glass, and wine spilled on her pants. She went to the bathroom, changed into pajama pants, and placed the soiled pants in the washing machine. She placed the broken glass in the trash. The victim testified that Defendant also broke another wine glass, and she changed a second time and placed her clothes in the washing machine. She said that Defendant kept trying to talk to her but had to write notes because he "stuttered a lot." The victim testified that she lost patience in trying to talk with Defendant so she began talking to Mr. Cannon and Ms. Hudgins. She identified several notes written by Defendant. The victim testified that there was some dancing at the gathering and that everyone was dancing in the same area of the livingroom. She said that one of the songs picked out was an "old school" song, and "we were cutting up about it." They then

"[d]ecided to get up and do some old school moves. Cabbage Patch, you know. Just silly things." The victim was aware that marijuana was also being used in the apartment, but she did not smoke any of it.

At some point, the party began to break up, and most everyone decided to go downstairs and watch television. The victim testified that Anthony and Ms. Hugins left the party first, and she talked some more with Defendant and Mr. Cannon. She said: "I made it very known during the night - - well, I guess during the morning hours that I was ready to go to sleep. I was really tired." The victim testified that Mr. Cannon went downstairs, and Defendant wanted to continue talking to her. She said:

> So I allowed him to. He stuttered a lot. And I felt - - I wouldn't say I felt bad for him. I was trying to be patient with him because he was stuttering and I wasn't trying to be mean. Get out of here. I don't want to talk to you any more. I was trying to be understanding.

The victim testified that she suggested that Defendant write notes because it was "quicker than me trying to listen to the conversation." Concerning the conversation, the victim said:

> It seemed like the same thing. Him just constantly telling me that he likes me. And, you know, what can I do to get with you. And after a while I wanted to stop being nice. So I started to ask him questions that were just kind of redundant. Like, oh, well, what are you looking for? Longterm? Yes, longterm. Oh, well, I'm looking for short term. What do you look for in a girl? Oh. And then I'd just tell him the opposite of whatever his answer was to make him go away. Told him that I did have a boyfriend. And sorry about that, but - -

The victim testified that while she and Defendant were talking, Mr. Cannon came back upstairs several times. She said that she agreed to one more dance with Defendant to get him to leave. The victim testified that Defendant had her up against the bar dancing the final time that Mr. Cannon walked in, and Defendant seemed to be aggravated that Mr. Cannon was there. She gave Mr. Cannon "a look like, hey, would you take him with you." Mr. Cannon and Defendant walked into her bedroom to talk, and Defendant locked the door to her apartment after Mr. Cannon left.

The victim testified that after Mr. Cannon left, Defendant moved close to her by the couch, and she then was either pushed or fell backwards on the couch. She said:

> And he was on top of me. I shoved him off to the side and got up. And that's when I told him, hey. I said nothing is going to happen. Not interested, you

know.  I'm sorry if you think that I led you on in any kind of way.  He said, no, absolutely you didn't lead me on.  I just really like you.

The victim then suggested that she and Defendant go downstairs and watch an A's game on ESPN.  She said: "It sounded really believable.  I thought if I could get him to leave with me downstairs then I could just come upstairs whenever I wanted to and go to sleep.  Defendant said that he would go downstairs if she would give him one more hug.

The victim testified that she gave Defendant a hug.  He then "ripped" her pajama pants down, and she tried to pull them back up.  She yelled for Defendant to stop and struggled with him.  The victim did not remember if Defendant carried her or if she was pushed into the bedroom and onto the bed.  She said that she was on her back, and Defendant got on top of her.  The victim thought that she could push Defendant off of her, and she was screaming the word "rape."  She then began screaming Ms. Hudgins' name in hopes that Ms. Hudgins would hear her.  The victim testified that Defendant did not like her screaming and covered her mouth and nose with his hand making it hard to breathe.  She said that Defendant did not stutter when he yelled, "Shut up, bitch."  Defendant then pushed her face into the side of the bed so hard that she thought her neck was going to snap.  The victim testified that she gave up struggling with Defendant because she did not want to die.  She said that her dog was barking loudly and tried to jump on Defendant, who shoved the dog off.  The dog eventually laid down on the bed beside her.

The victim testified that she noticed a "Ka-Bar" knife on her nightstand.  She managed to slide out from underneath Defendant,  grabbed the knife, and "went straight for his ribs."  The victim testified that she and Defendant both ended up on the floor, and he got "really mad" and pinned her hand down.  She said that he attempted to hit her wrist on the floor to make her let go of the knife.  Defendant then grabbed a pair of sharp scissors off her nightstand that she did not realize were there.  The victim testified that Defendant placed the scissors to her neck and told her to let go of the knife.  When the victim did not let go, Defendant pushed the scissors into her neck until she felt a "pop," and she knew that he had punctured the skin. She let go of the knife, and Defendant took it and held it against her neck.  The victim could not remember if Defendant told her to remove her pants and underwear or if he removed them with his hand.  While holding the knife, Defendant  penetrated her with his fingers and then ordered her to perform oral sex on him; however, her mouth was dry, and Defendant became angry because she could not perform the act.

The victim testified that Defendant then ordered her to get on the bed and bend over.  She thought that he performed oral sex on her and also used his fingers to penetrate her.  Defendant told her to get on her back, and he rubbed his penis on the outside of her vagina.

The victim testified that when she said something about it, Defendant said that he was not going to rape her. She said:

> And when he inserted his penis in my vagina and began to have sex with me or I guess began to rape me penally was when I leaned up on my elbows and I got right in his face. And I said you're raping me right now. Right now you're raping me.

Defendant denied raping her and said, "Women say no all the time when they really mean yes." The victim testified that the rape "went on for a certain period of time. And he pulled out and ejaculated on his hand." Defendant then went into the bathroom and wiped himself off with a dish towel. He grabbed her pajama pants and underwear, tossed them in the toilet, and then took them out and laid them on the floor.

The victim testified that Defendant walked back into the room and apologized to her. He also asked if it was her first time and if she was going to cry. The victim testified:

> And I immediately looked at him. I said, oh, my first time getting raped? I said, no, this is an extracurricular activity for me. I was like of course it's my first time. And he said, oh, well, I'm sorry. And I said, yeah, it was really heart felt. Yeah. And he asked me if I was going to cry and I said no. Because all I could think is I'm not going to let this guy see that I'm vulnerable, that he hurt me or any sign of weakness. And I looked at him and I said I'm not going to shed one tear for you. I said I didn't even cry when I saw my own dead mother's body on the floor at her house. What in the world makes you think I'd ever shed a tear for you.

She said that Defendant began "balling up his fists like he was just going to knock me in the mouth because I just kept going off on him." The victim stopped, told Defendant that she was sorry, and asked what he wanted her to say. Defendant was still standing over her with the knife, and he eventually took her driver's license from the nightstand and placed it in his pocket. He asked the victim if she was going to call police, and she said no. The victim testified that when Defendant walked toward the door, she asked him to leave her knife and driver's license. However, he did not say anything and walked out the door. The victim said that Defendant also took the kitchen towel that he used to wipe himself with after the rape, which she later found along the roadside while walking her dog.

The victim testified that she found some pants to put on and then went to the kitchen for a cigarette because she was upset. She noticed that Defendant had taken all of the cigarettes and all of the notes from the table that he had written. The victim locked the door

and then saw that Mr. Cannon had been sending her text messages "the entire time." She did not initially text him back because she thought that Defendant was downstairs with him. However, Mr. Cannon told her that defendant was gone, and she told him what happened. The victim testified that she also called her best friend, John Vo, who came to her apartment and told her to call police. She initially refused to call police because she was afraid Defendant would come back; however, Mr. Vo talked her into calling them.

When police arrived, the victim testified that she was "almost hyperventilating" because she was so mad and that her "heart was jumping through [her] chest." She told them that a guy named "Twin" raped her. The victim also told police about Defendant's tattoo. Mr. Cannon then came upstairs and told police Defendant's real name. The victim was taken to the hospital by ambulance around 9:00 or 10:00 a.m. She said: "I went in and then I was put into a room where they did the rape kit." The victim testified that medical personnel gathered information from her, but she did not believe that she told them everything because she was "kind of in shock." She said that there was a puncture mark on her neck from the scissors and two lined bruises on her back from her bra straps. Although no other bruises appeared while the victim was in the hospital, she said that bruises appeared on her jaw, neck, and face a couple of days later, and she was extremely sore. The victim testified that for the rape kit, swabs were taken of her genitalia, breasts, and her abdomen because she told medical personnel that Defendant's mouth had been in those areas.

Suzanne White testified that she went to Gentleman Jim's with the victim and Cindy Hudgins. They met Mr. Cannon, who was there with Defendant and someone named Anthony. Mr. White said they remained at the bar until at least 2:30 a.m. She did not see any flirting between Defendant and victim, and everything seemed normal. Ms. White testified that everyone decided to continue "hanging out" at the house on Arnette Street. After arriving home, Ms. White discovered that she had left her debit card at the bar, and she drove back there to get it. She returned home after 3:00 a.m. and went to bed because she had to work later that morning. She never heard anything after she went to sleep. Ms. White testified that she woke up around 8:30 a.m. and saw Anthony and Mr. Cannon asleep on the couches, and she saw Ms. Hudgins go to bed. She also saw Defendant leaving "rather quickly" in his car. Ms. White testified that EMS personnel arrived, and she directed them to the victim's apartment. She later spoke with police and gave a statement. Ms. White testified that when the victim returned from the hospital, she noticed a red mark on the victim's neck, and the victim later complained about being sore.

Cindy Hudgins testified that after arriving home from Gentleman Jim's, she went upstairs to the victim's apartment with everyone else, and Ms. White went to bed. She said that everyone "hung out" and listened to music. She was not aware of any dancing or marijuana in the apartment, but there was alcohol, and she did not see any hugging or kissing

between Defendant and the victim. Ms. Hudgins testified that she, Anthony, and Mr. Cannon went downstairs around 7:00 a.m., and the television was turned on. She said that Mr. Cannon walked back upstairs a couple of times. She then went to bed around 8:30 or 9:00 a.m. When she woke up, Ms. Hudgins testified that paramedics were in the house. She talked with police and gave a statement. Ms. Hudgins testified that she saw the victim several days later, and she complained of soreness. She also saw bruises on the victim.

Officer Tim Meeks of the Murfreesboro Police Department testified that he was dispatched to 205 Arnette Street on April 11, 2007. He took a report and called for an ambulance and a detective. Officer Meeks testified that he spoke with Mr. Cannon and determined that Defendant was involved in the offense. He said that Mr. Cannon did not want to get involved and asked to remain anonymous because he was afraid that he would be killed. Officer Meeks noticed several red marks and a puncture wound on the side of the victim's neck. The area underneath her ear was puffy and swollen. He remained at the scene until a detective arrived and then drove to the area around Old Lascassas Road because he learned that Defendant fled when officers attempted to make contact with him.

Officer Meeks, a trained "master tracker," testified that he determined the point where Defendant entered the woods and secured the scene until a canine officer arrived. He said that it appeared Defendant had lost one of his shoes when he jumped off the shoulder of the road and ran into the woods. Officer Meeks then drove to the hospital and completed his interview with the victim. He also took custody of the rape kit and later turned it over to Detective Wayne Lawson.

Detective Michael Taylor testified that he arrived at the scene on Arnette and spoke with Sergeant Sykes who gave him a brief synopsis of what happened. He and Sergeant Sykes then went inside the victim's apartment and processed and photographed the scene. Among the items processed were a pair of scissors on the night stand and a pair of wet pajama bottoms and underwear located on the floor next to the toilet. A leather knife sheath and a "wad" of hair were found near the bed. A broken wine glass was found in the trash near the kitchen area.

Officer Anthony Whitehead testified that he was familiar with Defendant's nickname, "Twin," and assisted in identifying him. He went to the Rutherford County Sheriff's Office on April 11, 2007, pulled up booking photos of Defendant, and learned that his address was listed as 1531 Center Pointe Drive. Around 9:30 a.m., he and officers John Singleton and Daniel Parkhurst drove to the address to see if Defendant was there. When Officer Whitehead knocked on the door and announced his presence, he heard commotion in the back of the residence and also heard Officer Singleton yell for help from the back of the house. He also heard Officer Singleton's weapon discharge. Officer Whitehead ran around the house and

saw Defendant running through the woods. Defendant was eventually taken into custody after being located by a canine unit. Officer Whitehead testified that he found a shoe that Defendant had lost during the chase.

Debbie Curtis was employed by Middle Tennessee Medical Center as a sexual assault nurse examiner. She assessed the victim on April 11, 2007, and collected evidence for a rape kit. She swabbed several areas on the victim to obtain DNA, and she photographed the victim's injuries. Ms. Curtis saw an injury to the victim's neck, and there was some trauma to her arm. There was some redness on her right breast and some linear red marks on her back.

Agent Lauralee Staples, a Tennessee Bureau of Investigation (TBI) forensic scientist assigned to the serology DNA unit, was an expert in the field of serology. She issued a report in the present case on April 2, 2008. Agent Staples found the presence of a limited amount of sperm on the victim's vaginal swabs, and she found saliva on the swabs from the victim's breast. She said that saliva was also present on the swabs from the victim's abdomen and genital area.

Officer John Singleton testified that he responded to 1531 Center Point Drive with the other officers and went around to the back of the house while Officer Whitehead knocked on the door. He said that Defendant emerged from the back of the townhouse at a "very fast pace." Officer Singleton told Defendant to stop and get on the ground, but Defendant did not heed his commands. Officer Singleton had his weapon drawn and pursued Defendant on foot to the wood line, where he and Defendant struggled, and Officer Singleton's weapon discharged. Officer Singleton testified that he backed up when his weapon discharged, and Defendant continued running. He remained behind the townhouse and waited for other officers to arrive. While Officer Singleton was waiting, a man who identified himself as a maintenance worker for the apartment complex said that Defendant had dropped or thrown something as he ran. The man pointed to the area, and Officer Singleton found a Ka-Bar knife without a sheath lying in the grass. Officer Singleton then turned the scene over to detectives.

Detective Doug Arrington testified that he also drove to 1531 Center Pointe Drive and assisted with the processing of the "secondary crime scene." When he arrived, there was a search in progress for Defendant. Officer Singleton told him that Defendant ran past him, and Officer Singleton's weapon discharged. Detective Arrington testified that a "United States Marine Corps fighting knife" was found in the area. He explained that it had been lightly raining prior to his arrival, and the grass around the knife was wet; however, the knife was dry. Detective Arrington then obtained consent from Taneisha Robinson, who identified

herself as Defendant's ex-girlfriend, to search her car and her house for a multicolored towel taken from the victim's residence.

Detective Craig Snider testified that he assisted in processing, photographing, and collecting evidence at the scene at 1531 Center Pointe Drive. He said that the Ka-Bar knife was found in an open field approximately eighty-six feet from the back door of the residence from which Defendant fled. Detective Snider testified that nothing else of significance was found in the residence or in Ms. Robinson's car.

Detective Wayne Lawson was dispatched to 205 Arnette Street around 10:00 a.m. on April 11, 2007. He made sure that the scene was secure and then drove to the emergency room at the Middle Tennessee Medical Center. He spoke with the victim and saw injuries to her upper back, bruising on her chest area, and a small puncture mark on the left side of her upper neck. The victim's clothing was also collected. Detective Lawson's notes from the hospital indicated that the victim told Defendant: "If you get off and leave right now, nothing happened." Detective Lawson received information from the victim that Defendant had tattoos on his arm that read: "twin" and "little." At the time, Detective Lawson knew Defendant had a twin brother named Eugene Porter, and some of the evidence in the present case improperly bore Eugene Porter's name. He said that the victim later came to the police department and gave a written statement.

On cross-examination, Detective Lawson testified that he received the rape kit on the afternoon of April 11, 2007, and "[it] would have went into evidence at the police department and would have been sent off [to the TBI for testing] sometime after that." He said that the kit did not sit in the trunk of his car for any period of time. Detective Lawson could not explain why the TBI showed that they did not receive the rape kit until March 4, 2008, when the offense occurred in April of 2007. He testified: "Other than sometimes rape kits are not immediately sent off from the police department to TBI. Sometimes there is a month, two months, three months. Sometimes there is a window where they're not sent immediately off."

Taniesha Robinson testified that she and Defendant dated for seven to eight months and lived together for five or six months. His name was on the lease of the townhouse at 1531 Center Pointe Drive, and he paid half of the rent. She said that Defendant had been out all night and was late getting home on the morning of April 11, 2007, and they argued because Defendant had her car, and she was unable to drive her son to school. Ms. Robinson said that Defendant told her that he had been at Gentleman Jim's and then went to someone's house with some friends. She said that Defendant "didn't have anything extra with him when he came in." Ms. Robinson testified that she and Defendant had a pending "domestic case," and he had bond conditions at the time. She acknowledged that Defendant was not supposed to be around her. She thought that was why Defendant fled when police knocked on the door.

Ms. Robinson testified that she gave police permission to search her residence and vehicle. She saw the knife that police found in the field, but she did not see how Defendant could have hid it in his pants.

Tyson Cannon testified that he introduced the victim to Defendant while they were at Gentleman Jim's at Defendant's request. He thought that the two sat beside each other at "different intervals" while they were at the bar. Mr. Cannon testified that he saw the victim and Defendant dancing together after they arrived back at the victim's apartment. He described the dancing as "[g]rinding and groping." He thought that everyone paired off and danced together at the apartment. He said that there were drugs and alcohol at the party. Mr. Cannon testified that he left the victim's apartment and went downstairs with Ms. Hudgins and Anthony. He said that Ms. White had been at the party but left earlier to go to bed. Mr. Cannon said that he went back upstairs three times because he left "articles of clothing up there."

The first time that Mr. Cannon went upstairs, he testified that the victim and Defendant were in the kitchen "talking and just being close." Music was playing at the time, but they were not dancing. The second time that he went upstairs, Mr. Cannon testified that the victim and Defendant were still in the kitchen but a little closer in the "corner of the countertop." He said that the two seemed to be having a good time, and he saw them kiss. Mr. Cannon testified that the third time he went upstairs, Defendant met him at the door. He said that the victim gave him "a look," but he could not tell what the look meant, and he did not take it as she was in distress.

Mr. Cannon testified that he went back downstairs and did not hear anything out of the ordinary while he was watching television. He later had a "text conversation with [the victim] going back and forth." Mr. Cannon testified that he then got a text from the victim that "something went bad upstairs." He walked upstairs and found the victim sitting on the couch with a man. The victim talked about what happened but did not want to call police. Mr. Cannon testified that police were finally contacted, and he was there when they arrived and gave a statement. Mr. Cannon testified that he never told police that he wanted to remain anonymous or that he was afraid for his life.

On cross-examination, Mr. Cannon testified that he was probably drunk while at the victim's apartment, and he and everyone else smoked marijuana there. He also said that he, Defendant, and Anthony were in the bathroom snorting cocaine. Mr. Cannon testified that after 9:00 a.m., the victim sent him a text in big letters stating that she had been raped. He said that when he got upstairs, the victim was on the couch "really calm and she was just pretty much chilling." However, in his statement to police, Mr. Cannon said that the victim sounded distraught. Mr. Cannon testified that he knew Officer Tim Meeks through a mutual

acquaintance, and they had attended the same social gatherings. He said that he told Officer Meeks that he did not want to ride in a police car, and that he wanted his "name out of it" because police already knew who the "Twins" were. Mr. Cannon said that he did not tell Officer Meeks that he was afraid that Defendant would kill him.

Officer Tim Meeks was recalled as a witness and testified that he knew Mr. Cannon through an upstairs neighbor, and Mr. Cannon had been to his house. He said that Mr. Cannon seemed a little hesitant or scared to identify "Twin." Officer Meeks testified that Mr. Cannon was also asked to get in a car and point out where Defendant lived. He said that Mr. Cannon indicated that if he said anything, "they" would kill him. "He said you know they're bangers. You know they're Crips out of Compton." Officer Meeks testified that Mr. Cannon seemed very timid and shaky during the conversation. Mr. Cannon later left the room and said that he vomited because he felt responsible for what happened to the victim.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant argues that the evidence presented at trial was insufficient to support his conviction for robbery because he did not take the victim's property by fear of violence because there were no further threats or acts of violence after the rape. We disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557–58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *ee Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the

prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236–37; *Carruthers*, 35 S.W.3d at 557.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2006). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A.§ 39–13–401. In *State v. Owens*, 20 S.W.3d 634, 641 (Tenn. 2000), our Supreme Court held that "the use of violence or fear must precede or be contemporaneous with the taking of property from the person to constitute the offense of robbery under Tenn. Code Ann. § 39-13-401." In *State v. Swift*, 308 S.W.3d 827 (Tenn. 2010), the Supreme Court reiterated the holding in *Owens* and said:

> We specifically rejected the continuous offense theory under which robbery is defined to extend to situations in which force is used after the taking, such as to retain property or facilitate escape. *Id.* at 640-41. We concluded in *Owens* that "the use of violence or fear was subsequent to the taking and temporally remote." *Id.* at 641.

*Swift*, 308 S.W.3d at 831 (citing and quoting *Owens v. State*, 20 S.W.3d 634, 641 (Tenn. 2000.))

In the present case, the taking of the victim's property, consisting of her driver's license and a knife, occurred after Defendant had raped the victim. He first pushed her face into the side of the bed so hard that she thought her neck was going to snap. He then threatened to cut her neck with a pair of scissors, which actually caused a small puncture wound on her neck. He later forcefully removed the knife from the victim's hand and used it to threaten her during the rape. The victim testified that she was still lying on the bed after the rape and said some things to Defendant which caused him to ball up fists "like he was just going to knock [her] in the mouth. . ." Defendant still had the knife and was standing over her at the time. The victim testified that as Defendant was taking her driver's license, he asked if she was going to call police. She said: "And I said I told him [no]- - because I thought if I told this guy that I'm going to call the cops, you know, he'll just kill me right then." Defendant then left her apartment with the knife and her license.

The proof shows Defendant took the victim's property by violence or putting her in fear, and Defendant's use of violence and fear preceded and occurred contemporaneously with the taking of the victim's property in this case. Therefore, the evidence is sufficient to support Defendant's robbery conviction.

### B. *Admission of Rape Kit Into Evidence*

Defendant next argues that the trial court erred in allowing into evidence the swabs from the rape kit collected from the victim. It appears from the record that prior to trial, Defendant filed some type of motion objecting to the admission of the rape kit. In a jury-out hearing on the matter, the following exchange took place:

[Defense Counsel]: Your, Honor, again I renew my comment about the DNA. We're going to talk about the DNA was taken and they've done these swabs and they've done all these other tests. They can talk about those things but how do we get to the point where those are relevant if they can't talk about the results? If the DNA is excluded then what's the relevance of allowing the State to even bring up that those things were done?

THE COURT: Okay. So tell me how it's relevant.

[Prosecutor]: Your Honor, the reason that they're relevant is we're not going to introduce the DNA. Your Honor has told us that. We respect that and we agreed to that. But what we are going to try to introduce, if the Court allows and I think it's relevant, is that she's going to tell the ladies and gentlemen of the jury that he had sexual intercourse with her. And that he performed oral sex on her. And he also -- on her stomach and the abdomen and the breast. The swabs when examined say that there's a presence of sperm in her vagina which corroborates that there was sexual intercourse of a recent nature and also the saliva on her body corroborates what she says about someone licking her.

THE COURT: So when did the defense get this information that there would be swabs?

| | |
|---|---|
| [Prosecutor]: | Months ago. |
| THE COURT: | So I think the reason I suppressed the DNA evidence was that ya'll just got that to them in the last week or two. |
| [Prosecutor]: | Two to three, but that's correct, Judge. Yes. |
| THE COURT: | But you're saying that had this other information prior to that. |
| [Prosecutor]: | Yes, sir. Absolutely. |
| THE COURT: | And the reason you're saying that's relevant is that that verifies that she did have some sort of sexual relations with somebody during that time period. |
| [Prosecutor]: | And that somehow saliva got on her body in areas that she said someone put them there. |
| THE COURT: | Okay. What do you say, Mr. Shannon? |
| [Defense Counsel]: | Well, the rape kit - - even the rape kit itself was not turned over to us immediately. When we filed our motion for discovery we were told at the very beginning - - I think Mr. Newman would agree, we don't have a rape kit. And we asked him repeatedly. Well, it's in the documents that there's a rape kit. She went to the hospital. That rape kit was found in Detective Meeks' car almost a year later. I believe it was March of 2008 when they finally turned it over to us. And this event took place - - |
| THE COURT: | So ya'll got it in March of 2008? |
| [Defense Counsel]: | I think we got it about a year after this. |
| THE COURT: | So you had it? |
| [Defense Counsel]: | We did have it. |
| THE COURT: | Okay. And I guess you knew about the swabs? |

[Defense Counsel]: We did.

THE COURT: And the saliva and other stuff.

[Defense Counsel]: We did.

The trial court then overruled Defendant's objection and allowed the swabs into evidence to show that the victim had sexual contact. During trial, Defendant questioned Detective Lawson rather than Officer Meeks about the rape kit and whether it sat in the trunk of his car for a while. Detective Lawson testified that he took possession of the rape kit on the afternoon of April 11, 2007, and that it would have gone into evidence and then sent to the TBI sometime after that.

The State argues, and we agree, that Defendant has waived consideration of this issue on appeal because he failed to include the issue in his motion for new trial. Tennessee Rule of Appellate Procedure 3(e) states, in pertinent part, that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, ... or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e); *see State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989); *see also State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (observing that an issue is typically waived when it is raised for the first time on appeal). Based on the foregoing, we conclude that Defendant has waived consideration of this issue by failing to preserve it for appellate review. Moreover, even if not waived, we fail to see how Defendant was prejudiced by admission of the evidence. The victim testified, without objection, that she was examined at the hospital, and a rape kit was collected. She also testified that she told medical personnel that there might be saliva on her breasts and abdomen because Defendant's mouth had been there. The trial court properly concluded that a presence of sperm and saliva on the swabs taken from the victim was relevant to show that she had recent sexual contact. Therefore, this issue is without merit.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-15-